**SABRINA P. SHROFF**　　　　　　　　　　　　　　　　　　　　　　　233 BROADWAY
ATTORNEY AT LAW　　　　　　　　　　　　　　　　　　　　　　NEW YORK, NEW YORK 10007
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　TELEPHONE: (646) 763-1490

November 12, 2020

**BY ECF**

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 10007-1312

　　　Re:　United States v. Michols Orsini Quintero, S4 19 Cr. 144 (AKH)

Hon. Judge Hellerstein:

　　　In a now all too familiar pattern of late discovery production, the government made 15 separate and discrete productions to Mr. Orsini Quintero months *after* the discovery cutoff in this matter and while he has awaited trial. In this regard, and many other regards he is differently situated from his co-defendant Mr. Coro. Each of these 15 late productions contain documents that were long available to the government. In total, the government has produced more than 6 *terabytes* of information[1] to defense counsel – all in the last six months and all of it late. Because the government has failed to comply with its obligations under Rule 16, *Brady* and *Giglio*, the government should be precluded from relying on any of the information contained in the 5 productions in its case-in-chief, in rebuttal, or at any *Fatico* or sentencing proceeding. Moreover, Mr. Orsini Quintero, who is incarcerated at MCC-New York, has no practical ability to review discovery expeditiously. Mr. Orsini Quintero should not be penalized for the government's late discovery productions. He should not have to choose between review of discovery and sitting in jail. To avoid such an unfair choice and one which violates due process, this Court should grant Mr. Orsini Quintero's motion for bail. Only then will Mr. Orsini Quintero be able to review discovery for material helpful to his defense, properly prepare for trial, and not be forced to choose between discovery review and additional pretrial incarceration. Bail is especially appropriate here as he is a first-time offender who has been in custody for a total of 20 months, while awaiting trial on an offense with a guidelines range sentence of 36 to 47 months. As Judge Ronnie Abrams held just days ago COVID is on the rise and the jails are simply not a safe place for anyone and especially not for Mr. Orsini Quintero.

　　　The government likely will contend that the Court should limit any relief granted to giving the defense additional time to review the late productions, including but not limited to the extremely large and unwieldy 15th production which also was not produced in reviewable form.

---

[1] "Considering that **one terabyte** is generally estimated to contain **75 million** pages, a one-terabyte case could amount to **18,750,000** documents, assuming an average of **four pages per document**. Further assuming that a lawyer or paralegal can review **50 documents per hour** (a very fast review rate), it would take **375,000 hours** to complete the review. In other words, it would take more than **185 reviewers** working **2,000 hours** each per year to complete the review within a year. Assuming each reviewer is paid **$50 per hour** (a bargain), the cost could be more than **$18,750,000**." https://cloudnine.com/ediscoverydaily/electronic-discovery/ediscovery-best-practices-perspective-on-the-amount-of-data-contained-in-1-gigabyte/#:~:text=%E2%80%9CConsidering%20that%20one%20terabyte%20is,o%20four%20pages%20per%20document (bold emphases in original).

Honorable Alvin K. Hellerstein
November 12, 2020
Page 2

Any such proposed relief should be rejected by the Court, as it would prejudice Mr. Orsini Quintero by keeping him in jail longer, while improperly rewarding the government for its serial failures by giving it more time to continue its investigation. Appropriate bail and preclusion of the late-produced information is the correct remedy here.

## RELEVANT FACTS AND PROCEDURAL HISTORY

### The Government's Untimely Discovery

Mr. Orsini Quintero was indicted in March 2019. Rule 16 discovery was to be complete by September 2019. From September 2019 to June 2020, the government made no discovery productions. Then, commencing in June 2020 and continuing through today, the government began producing terabytes of information to defense counsel, mostly regarding the government's confidential source (the "CS" or "Mr. Marin"). The government has no valid excuse for this late production, and nothing about this late production is the result of the government's recent arrest of its CS.

### Defense Counsel Repeatedly Raised Concerns
### About the Case and the Confidential Source

Throughout this case, defense counsel has repeatedly argued to the government Mr. Orsini Quintero's limited role in the charged conspiracy. Unlike the others charged, he owns no companies, is not connected to anyone in the upper echelon of the Venezuelan political community and is a person of very limited means. Many of these facts were reflected in the government's initial productions but it was the late discovery productions that brought this point home for the government. Mr. Orsini Quintero believes that he received the same Rule 16 productions as co-defendant Victor Mones, with one exception. See, Dkt. Entry 137-1, Exhibit A to Victor Mones Coro's Motion for Discovery Sanctions.

Late productions by the government brought home yet another point: their CS was untrustworthy. As the government began producing discovery about him in 2020, the defense raised its concern that the CS was engaging in improper conduct, prevaricating and at times outright lying. For example, the CS repeatedly approached Mr. Orsini Quintero's wife and questioned her about her husband's case, including whether Mr. Orsini Quintero planned to go to trial and whether he was content with his court-appointed lawyer. Even more troubling, it appears Mr. Marin continued to employ Mr. Orsini Quintero's wife without informing the government or the case agents of this ongoing relationship.[2] And, of course, Mr. Marin fully failed to inform the

---

[2] When the defense informed the government of Mr. Marin's continued interactions with Mr. Orsini Quintero's wife, and that these interactions were wholly inappropriate as Marin was acting as an agent and CS of the government at the same time, the government conducted only the most non-serious of inquiries. The government merely had the same agents who were handling the CS ask the CS about these concerns, and then wrote defense counsel that the CS had denied engaging in that conduct, that he had only asked "why she doesn't know /what's happening" and that the government chose to believe his story. It appears that the government made no other inquiries, nor made any effort to check the CS' veracity. Of course, the CS, Mr. Marin, was lying. Mrs. Orsini Quintero had been repeatedly and directly questioned by Mr. Marin for months, complained to counsel who then instructed her to simply say she was out of the loop. Rather than recount the entire history of his questioning of her as an agent of the government, DHS Mr. Marin told half the story which is what the government memorialized in their ROI.

Honorable Alvin K. Hellerstein
November 12, 2020
Page 3

DHS agents that he was engaged in conduct that even the government categorizes as immigration fraud throughout the time he was cooperating and getting others arrested.

Defense counsel also raised other concerns, such as the amounts of financial benefits being bestowed upon the CS by the government and by law enforcement, including giving him large amounts of money that supported a business that was in constant debt and which would not have stayed afloat but for the government's infusion of currency. Also communicated to the government was defense counsel's concern that the agents in charge of the investigation were far too close to their confidential source and he to them. The level of closeness in this case and the tone of the communications was concerning. Chats between the DHS agents and Mr. Marin reveal a level of familiarity and deference to a CS not commonly seen. To elucidate, Mr. Marin was comfortable texting a DHS agent about the problems with his application for "citizenship" and telling the agent he was up against the clock, and needed their help. When the agent wasn't as prompt in his response as Mr. Marin would have liked he complained and demanded help:

> Good morning, please can you ask George (DHS agent) why is so difficult to help to expedite something that is eminient like my citizenship? Man nothing that he *promised* happened, same thing and *cluster fuck situation* I do have with IRS if I tell you how many times will said not to worry about it I am going thru a very delicate situation where about 20 people depends on my company, sorry TJ to tell you this but realistically this is BS, I (why) can not HSI can't talk to HSI to ….

Even here Mr. Marin lied. One the 20 employees who "depended" on him and his company, one such employee was Mr. Orsini Quintero's wife whom Mr. Marin sponsored for a green card. Instead of simply paying her as an employee, he kept her on the books and paid her only to then insist that she return the money to him, thereby arguably committing immigration fraud.

The government has so little interest in ascertaining the *bona fides* of their source that they did not learn such basic information as who Mr. Marin employed at Jet Saver; how he paid his employees; if he in fact actually paid his employees;[3] and/or that he had expressly and repeatedly encouraged employees of his choosing, including Mr. Michols Orsini and David Torres, to go and work for Victor Mones, another of the people Mr. Marin was setting up for arrest. Seemingly without the agents' knowledge, Mr. Marin promoted the criminal activity for which he was getting payment and "perks" like DHS help with obtaining U.S. citizenship.

All of this conduct occurred over a period of time and went undetected by law enforcement. Also ignored by DHS was the missing hundreds of thousands of euro, $140,000 of which was pocketed by Marin and which the DHS agents never followed up on until they were pushed by counsel for Mr. Mones. Only then did the DHS agents finally confront their CS about the missing money. See dkt. entry #s 122 at pages 12, 12, and dkt. entry # 137. As these facts are discussed in depth in the briefing submitted by Victor Mones (dkt. entry 124 and 137), we do not repeat them here. Suffice it to say that, at every turn, self-servingly credulous DHS agents and the government

---

[3] In keeping with his pattern of lying about others, when confronted by this fact, Marin told the agents that it was Mrs. Orsini Quintero who would not show up to work which is why he asked her for her wages back. Of course this makes no sense. An employee doesn't show up for work – an above board employer simply fires them. That is not what Mr. Marin did – he kept Mrs. Orsini Quintero around and repeatedly and over months questioned her about her husband's case.

Honorable Alvin K. Hellerstein
November 12, 2020
Page 4

turned a blind eye and chose to believe Marin as only then could they keep him on as a source. Not once did either the agents or the prosecutors do the simple math over two years ago that would have led them to the information that they eventually ended up producing in 2020.

There are several such examples. Each time defense counsel pointed out a weakness or fallacy in the government's case, the government would go speak to the CS who would conveniently "remember" new facts that, *mirabile dictu*, cured the defect without compromising the source. This dubious new information was then promptly memorialized and produced/whitewashed in an ROI as Rule 16 discovery. This went on from June to October of 2020. [4]

In one instance, in August 2020, after defense counsel pointed out there was no indication or evidence of Mr. Orsini Quintero having the requisite knowledge that Samark Lopez was on the OFAC list, Mr. Marin suddenly "remembered" that at birthday party/picnic for the chief pilot he had announced to all the pilots that Samrak Lopez was in fact on the OFAC list and that providing services to him was a sanctions violation. Remarkably, the only proof Mr. Marin could provide of this alleged event was an undated photo of a group of men gathered outside, but the government still accepted Mr. Marin's newly-minted memory as truth. Of course, Mr. Marin was lying. The photo was of a birthday party that took place in 2016 – well before Samark Lopez was even put on the OFAC sanctions list.

Mr. Marin's story then changed. He "corrected" himself and placed the conversation at a different picnic – this one after Samark Lopez was placed on the sanctions list. Marin also changed the details of his memory, now identifying another pilot David Torres (his good friend who had helped cover up Mr. Marin's adulterous relationships) and Mr. Orsini Quintero's wife's as having heard him make that pronouncement. ████████████████████████████████████████████████████████████████████████████████ claim to remember this conversation. Left unexplained is how the agents who have spent three years (2017-2020) investigating this case were never previously told about this supposed public announcement regarding Samark Lopez Bello by either cooperator.  Also left unexplained is why the government chose to continue credulously promoting Mr. Marin's fantasy as fact, despite him supposedly remembering this episode only after it was needed to paper over a material flaw in the government's case, and then entirely revising his too-convenient story once it was proven false.

Mr. Marin has now been arrested for making false statements. He appears to also have obstructed justice but for some reason he is not charged with that crime or theft of government property – the $140,000. The government still refuses to disclose to defense counsel: (i) exactly how many false statements were made to them by Mr. Marin; (ii) who else Mr. Marin tainted by virtue of his position as the boss and owner of Jet Saver; (iii) how much financial and non-financial consideration the government gave Mr. Marin, (iv) why the government chose not to charge him

---

[4] Although the texts make clear that Mr. Marin was regularly asking for, and getting help, in his application for citizenship and resolving his tax issues, he complained that the agents had made him promises that were not kept. An irate Mr. Marin wrote: Man, nothing he (DHS Agent George) promised happened. The complaints continued and Mr. Marin let the agents know that they had made to him promises that were simply not kept: [j]ust pass this message to George, let him know th[e] at the end of the day, the only one thing to keep and guard your honor is your word! This is unbelieve able….."

Honorable Alvin K. Hellerstein
November 12, 2020
Page 5

with theft of government funds, wire fraud and money laundering; and (v) whether the handler and other DHS agents who were (and are) in charge of this investigation were subject to disciplinary review. All this information is material; none of it has been produced.

**The 15 Productions at issue**

In June 2020, nine months after the close of fact discovery in this case, the government began the first of its 15 discovery productions, the last of which was to be produced on October 23, 2020, over a year after discovery closed. Much of the information provided in these 15 productions concern the CS. In these 15 productions are (i) notes from case agents; (ii) case agent reports; (iii) notes taken by the AUSAs; (iv) chats between the CS and several DHS and DEA agents; (v) chats between the CS and Leon; (vi) emails between the CS and those charged on the indictment; (vii) hard-copy documents; (viii) contents of entire computers and devices seized from My JetSaver, the company owned by the CS.

We understand that still missing from the government's production is such relevant information as (i) the amount of money DHS provided to its CS; (ii) the things of value provided to the CS; (iii) the false statements made by the CS to the government; (iv) notes of conversations between the DHS agents and the CS upon the CS's arrest for false statements; and (v) notes of conversations between the government and counsel for the CS.[5]

While all the productions are time consuming to review, many months late, and a serial burden on an incarcerated and indigent defendant, the last "production" was effectively unreadable and unusable (with no re-delivery yet).

The government's last attempted production took place on October 25, 2020 -- approximately 20 months after Mr. Orsini Quintero's arrest and 13 months after the close of discovery.[6] The government has informed that the production will consist of over 5.7 *terabytes* of compressed data from My JetSaver, the company owned by their CS, Marin, and with whom DHS had worked for at least three full years. Undersigned counsel for Mr. Orsini Quintero has not reviewed the hard drive because (i) we learned from co-counsel that the contents of the hard drive were impossible to review without processing and the aid of an expert; and (ii) we also learned from co-counsel that the government had included in that production the full image of a computer owned by DHS that contained confidential material about other investigations. Understandably, these two gross production errors made any effort to review futile.

Plainly, otherwise unable to meet its deadline, the government simply dumped on counsel for Mr. Mones a production that was wholly unreviewable and careless. Mr. Orsini Quintero is now trying to retain an expert to assist in the review, but, having learnt of all the issues associated

---

[5] There is no privilege between government counsel and counsel for Mr. Marin, and Mr. Orisni is entitled to know, among other things, what the government said to counsel for Mr. Marin that led him to consent to detention and abandon his bail application in the Southern District of Florida.

[6] The production was due October 23, 2020, but nothing was produced that day. Two days later the government produced the hard drive, a copy of which is available for the Court's ready review. The hard drive is unreadable. It also appears that the government inadvertently included in its October 25, 2020 production to the defense a full image of *an internal DHS computer* containing information concerning other unrelated investigations. Given all this, there has been no review by Mr. Orsini Quintero of the hard drive.

with the hard drive, has not otherwise taken steps to receive the drive. It is impossible to say much more about this unacceptable production and the resulting hardship and burden on the defense, except to respectfully refer the Court to (and incorporate as if fully set forth herein) the affidavit of Bryan Gorczyk, attached as Ex. C to Mr. Mones' motion, which sets out the condition of the government's last production and the effort and cost of rendering it reviewable. In addition, if the Court wishes to make its own evaluation, we offer to provide to it an exact copy of the hard drive provided by the government to defense counsel.

In the absence of the relief requested herein – preclusion and bail – Mr. Orsini Quintero will be unfairly burdened and prejudiced by the government's untimely and improper productions.

## ARGUMENT

It is respectfully submitted that the only cure for the government's violations and the resulting prejudice to Mr. Orsini Quintero is for the Court to preclude the government from using any of the discovery from these last 15 productions in any proceeding or stage of this matter. To do otherwise would punish and prejudice Mr. Orsini Quintero. He should not be the party prejudiced by the government's late and disorganized production of terabytes of information. *See* Argument, Point I below.

Moreover, to give Mr. Orsini Quintero proper due process, meaningful access to counsel, and a fair opportunity to choose between trial and plea, it is respectfully submitted that the Court should grant Mr. Orsini Quintero bail, because he (a) meets all the conditions for bail, and (b) can only meaningfully assist in his own defense and properly review the discovery for material helpful to him if he is outside of prison. Review of discovery in MCC-New York is nearly impossible given the current pandemic lockdown. Bail is especially appropriate here as Mr. Orsini Quintero has been in custody for a total of 20 months, while awaiting trial on an offense with a guidelines range sentence of 36 to 47 months. *See* Argument, Point II below.

I. **THE GOVERNMENT SHOULD BE PRECLUDED FROM USING ANY OF THE INFORMATION FROM ANY OF ITS 15 UNTIMELY PRODUCTIONS**

Courts can and should sanction the government for criminal discovery violations or late-produced discovery. No case law is required for this well-settled proposition. This very court has noted that preclusion is a possible remedy here and, for the reasons discussed, it is respectfully submitted that it is the appropriate remedy.

Preclusion of the government[7] is also the less cumbersome of remedies – it eliminates the need for the Court to hold a hearing on the serial lateness of the government's discovery

---

[7] Precluding the government from relying on its discovery in its case does not mean that Mr. Orsini Quintero also should be precluded from using the discovery. The government had an obligation to produce (and still does) material helpful to Mr. Orsini Quintero and indeed, the discovery is helpful to him, as it evidences that he was not involved in the conspiratorial activity between Mr. Marin, Alejandro Leon Maal, Mones Coro, Tareck El Aissami, or Samark Bello. The discovery tells the government what it knew, or should have known, all along – that Mr. Orsini Quintero was a contract employee who worked for Marin and then, at Marin's suggestion, for Mones Coro. That reality is reflected in the recent plea agreement provided to Mr. Orsini Quintero, which grants him a two-point reduction for minor role.

productions, and to decide if the government's lateness was a result of carelessness or malice. While other defendants – e.g., Mr. Saipov in *United States v. Sayfullo Saipov*, 17 Cr. 722 (VSB) – have asked the Court to hold an evidentiary hearing to determine whether the government's untimely production was intentional; assess the accuracy and thoroughness of the government's search of its files for discoverable materials; and obtain a more reliable assurance that the government has produced all of Mr. Saipov's written or recorded communications in its possession, custody, or control; we do not seek such relief. Such a remedy improperly would prolong and increase the burden on Mr. Orsini Quintero. Indeed, preclusion is the only remedy that does not perversely benefit the government by putting in its own hands the ability to gain additional time to prepare its case and otherwise continue imposing the burden of the government's serial errors upon Mr. Orsini Quintero all the while keeping him detained.

## II. THE COURT SHOULD BAIL MR. ORSINI-QUINTERO

The government made its late productions because they contain information material to Mr. Orsini Quintero's defense, and he should have the opportunity to review and use the discovery; rather than being forced to choose between continued detention and discovery review. Discovery review in this case is a herculean task made even more difficult when the client is detained. For these reason and the others discussed below, the Court should grant him bail.

The Eighth Amendment to the Constitution states: "Excessive bail shall not be required." U.S. Const. Amend VIII. Accordingly, 18 U.S.C. § 3142(b) "requires the court to order the pretrial release of a defendant on a personal recognizance bond 'unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'" *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). "The traditional right to freedom before conviction permits the unhampered preparation of a defense and serves to prevent the infliction of punishment prior to conviction." *Stack v. Boyle*, 342 U.S. 1, 3 (1951).

"The Bail Reform Act limits the circumstances under which a district court may order pretrial detention." *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988). The government may make a motion for detention "only when the charge is for certain enumerated crimes, 18 U.S.C. § 3142(f)(1) (crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or felonies committed by certain repeat offenders), or when there is a serious risk that the defendant will flee, or obstruct or attempt to obstruct justice. *Id.* § 3142(f)(2)." *Friedman*, 837 F.2d at 49.

If the government makes a motion for detention under 18 U.S.C. § 3142(f), a court must undertake a two-step inquiry. *First*, a court must determine whether the government has proven by a preponderance of the evidence that a defendant is charged with one of the enumerated crimes; is a serious risk of flight; or is a serious risk to obstruct justice. *See Friedman*, 837 F.2d at 49. *Second*, if the government sustains that burden, the court must further determine if the government can prove that there are no conditions of release that will reasonably assure the defendant's appearance in court and the safety of the community or any person. *Id.* The Bail Reform Act requires only "reasonable assur[ances]" not guarantees. *Id.*

Honorable Alvin K. Hellerstein
November 12, 2020
Page 8

If detention is sought on the ground of dangerousness, the government bears the burden of demonstrating "by clear and convincing evidence" "that no condition or combination of conditions will reasonably assure the safety of any other person and the community." § 3142(f); *accord United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

Here, Mr. Orsini Quintero cannot be detained on the theory that he is a serious risk of flight. Mr. Orsini Quintero has immediate family in the United States, and he has long sought to remain here to raise his two children and support his wife. Further, he already has served 20 months in custody in a matter where he faces a guidelines range of 36 to 47 months according to a plea agreement proposed by the government. Given all this, Mr. Orsini Quintero is not a serious flight risk.

Nor can the government prove, by clear and convincing evidence, that Mr. Orsini Quintero is such a danger to the community that no conditions of release can reasonably assure its safety. His charged offense does not qualify as "a crime of violence" or other offense enumerated in § 3142(f)(1), and there is no "serious risk" that he will attempt to obstruct justice if granted appropriate bail, § 3142(f)(2). *See United States v. Dillard*, 214 F.3d 88, 89 (2d Cir. 2000).

Mr. Orsini Quintero is a father of two children who has never engaged in violence or been convicted of a felony. He intends to stay with his family here in the United States and fight the charges against him. His wife is ready to sign a bond for him and, if released, he will reside in his wife's house in the Middle District of Florida, under home detention and subject to electronic monitoring.[8]

Accordingly, because the Court can set conditions (*e.g.*, a reasonable bond and home detention with electronic monitoring) which can reasonably assure the safety of the community and his return to Court, bail should be granted.

---

[8] Mr. Orsini Quintero has a detainer and should the detainer not be lifted, he will be taken to immigration custody first and will seek bail there.

Honorable Alvin K. Hellerstein
November 12, 2020
Page 9

## CONCLUSION

The prejudice to Mr. Orsini Quintero is apparent. The appropriate cure is bail and for the government's use of the late productions to be precluded. For all the reasons stated herein, the Court should grant Mr. Orsini Quintero that relief.

Respectfully submitted,

 */s/ Sabrina P. Shroff*
Sabrina P. Shroff
Counsel to Mr. Orsini Quintero

SPS/hls

cc: All counsel of record